## Mann *v.* Arkansas Valley Land & Cattle Co., (Limited.)

*(Circuit Court, D. Colorado. June 5, 1885.)*

1. CONVERSION OF CATTLE—BONA FIDE PURCHASER—NOTICE.
    One who purchases for value and without notice, from a stranger, cattle that have strayed from their range and been taken possession of by such stranger, will be liable for conversion if he refuses to deliver them to their owner on demand made by him.

2. SAME—MEASURE OF DAMAGES.
    The measure of damages for such a conversion will be the value of the cattle with their increase to the time of demand, with legal interest thereon from the date of the demand.

3. WITNESS—CREDIBILITY—FALSE TESTIMONY.
    The jury may disregard altogether the testimony of a witness who has willfully and knowingly sworn falsely in respect to any material matter in the case.

At Law.

*R. E. Foote* and *Wells, Macon & McNeal*, for plaintiff.

*Hugh Butler*, for defendant.

HALLETT, J., *(charging jury.)* There is a great mass of testimony in this case directed to one proposition only: whether the cattle belonging to the plaintiff came into the defendant's possession and were retained by it. It is true that several questions are involved and embraced in this proposition; as (1) the title of the plaintiff to the herd which he claims to have purchased from Schlagel & Jordan in the fall of 1880, and which was branded, as he says, with a bar brand. This is contested by defendant upon the ground that he did not then obtain an absolute title to the property; though it is conceded that he subsequently acquired such title. That is a matter which will not require very much attention. The bill of sale which was given by Schlagel & Jordan to the plaintiff at that time, after providing the terms of payment, and the way in which the value of the cattle should be estimated, did provide that the sellers should have and retain possession, or the right of possession, until the cattle should be paid for. This was obviously a security for a deferred payment. Some cattle—about 600—were to be taken to Omaha or Council Bluffs, and there sold for a sum not less than the price specified in the contract, and

Schlagel & Jordan were to receive the proceeds of the sale. This transaction was to be carried on by the plaintiff according to the terms of the contract, in the name of Schlagel & Jordan. So far as disclosed on the trial this was done.

In Omaha some dealings were had with Sheedy & Clark, of which it is not necessary to say very much. Schlagel & Jordan, in that transaction, assumed to be the owners of the property,—Mr. Mann, the plaintiff here, joining them; but it would seem that the money obtained in that transaction was for Mr. Mann's benefit, and while Schlagel & Jordon were still insisting upon their lien on the cattle at that time. I believe they agreed to relinquish it to Sheedy & Clark, and take other security for the money that was due them, and they were still recognizing the sale that had been made to Mr. Mann, and what they were doing was to protect their security. It is not necessary to consider what the rights of Schlagel & Jordan were under these transactions, and what position Mr. Mann assumed towards them. For the purposes of this controversy it may be said, in all that took place between the parties, and the several contracts that were made, that Mr. Mann became the owner of this herd in the month of October, 1880, as he claims to have done.

Then there is a great volume of testimony as to the possibility as to whether this herd in fact did come into this state from Sheep Creek basin, where they were turned loose, and the possibility of their doing so, and so on; whether the Black Hills mountains formed a barrier which at that season of the year they could or could not pass; whether they were seen at the junction of the Laramie and Platte rivers; whether they came south by way of Horse creek, crossed the railroad near Egbert station, and passed on into this state. All that evidence was given for the purpose of proving whether the cattle came to this state. The evidence offered by the plaintiff on that subject was for the purpose of showing that the cattle came into this state, and for the purpose of identifying them as the animals which were turned out at Sheep Creek basin. It was necessary to establish the proposition that they came into this state, so as to make it plausible and reasonable that they came afterwards into the possession of Mr. Bloomfield and of the defendant. Now that evidence has no other importance than to establish the fact or disprove the fact—the truth of the proposition—that the cattle did come into this state during that winter—the winter of 1880-81.

I have an instruction from the defendant's counsel to the effect that if, in your opinion, any portion of that testimony is false or untrue, that defeats the whole case. That is not true, unless it appears to you the cattle never did in fact come here. As I have already stated, the object and purpose of all that testimony is to show whether the cattle did or did not come into this state; and, notwithstanding the failure of any part of that evidence to establish the fact to which it is directed, if you should be of the opinion, nevertheless, that

the cattle came into this state, or, if only a part of them, then some part, the failure of such testimony would not affect the result.    But, of course, if the failure of such testimony would have the effect in your minds to satisfy you that the cattle never reached this state, or came here, then of course they could not come into the hands of Mr. Bloomfield, or of this company, the defendant.

It is not necessary or proper that I should comment upon that testimony.    It is directed, first, to prove that the cattle must have died in or near the country in which they were turned out,—the cattle of both herds, the Gillespie herd, and the others, the Schlagol & Jordan herd, also; and next to prove that the state of those mountains—the Black Hills range—was such that they could not possibly or probably pass them; that they never did come on this side of those mountains at all; that all the witnesses who testified to seeing them in Wyoming or this state afterwards were mistaken, or swore falsely in respect to those matters.    Of course, all that testimony has been discussed before you by counsel at great length, and if you are of the opinion, on full consideration of it, that the cattle, or some part of them, came into this state, were in this state in the spring of 1881, and subsequently, then the question arises, what became of them here?—whether they came into the hands of Mr. Bloomfield.    Up to the fall of 1882 Mr. Bloomfield was doing business for himself,—during the years 1880, 1881, and 1882, until the autumn of the latter year,—when it seems he sold his herd to the defendant in this case, the Arkansas Valley Land & Cattle Company, and he became the manager of the company.

If the cattle passed to the company in any way, they must first have been in the hands of Mr. Bloomfield during the year 1881 and the greater part of the year 1882, until the time when he turned over his herd—sold his herd and turned it over to the defendant.    Upon that subject the plaintiff has offered some testimony of witnesses who state that Mr. Bloomfield asserted a claim to some of these cattle, and took possession of some of them; that many of them were seen in the neighborhood of his ranch and upon his range, and that he actually asserted a claim to them.    That is met by the testimony of many persons who state that they were engaged, similarly to those who testify for plaintiff, in gathering cattle during the years 1881 and 1882,—gathering the cattle that Mr. Bloomfield laid claim to,—and they saw nothing of these particular cattle.

You will perceive a great conflict of testimony that has arisen upon this subject, and it must be conceded by every one who has heard the testimony that it is very striking and very strong.    It is hardly to be explained on the theory. that those witnesses may be mistaken on one side or the other, and their statements harmonized so as to make them stand with each other.    There must have been some false testimony on one side or the other; and the question is for your determination where the truth lies.    Those witnesses, as far as I can

see, had equal means of observation; they were with the cattle,—"handling" them, as they express it; that is the word they use, though, I suppose, none of them actually put hands on them; but they were with them, and, so far as I can see, they had equal means of observation. I think this circumstance may be adverted to: that when men gather cattle for a particular person, if they find some with the brand of that person on them, perhaps they do not pay strict attention to other brands that may be found on the same cattle.

It is rather natural that they should rely upon the brand on which the cattle are held. That some of the witnesses did not observe the brands on the cattle very closely, may be accounted for upon that theory; but that does not go all the way towards harmonizing the statements of these witnesses, because some of them testify with considerable particularity as to what they could see on the animals, and they saw nothing more than they described. Some of them admit that they are unable to remember all the brands that they saw on the cattle. Perhaps it may be said of them, they are unable to describe what they cannot remember.

With this conflicting testimony you are called upon to decide, and it becomes your duty to decide, upon this occasion between these parties. If you arrive at the conclusion that Mr. Bloomfield did take possession of the cattle of the plaintiff; that they were in this state, and he did take possession of them in 1881 and 1882,—then how many were turned over by him to the defendant company? How many, if any? Some of the witnesses on the part of the plaintiff testified that certain of these cattle were turned over by Bloomfield and driven over to the range of the Arkansas Valley Land & Cattle Company, on the Arkansas river. Others deny this—others who were with those herds. There, again, is the same conflict of testimony which exists with respect to the other matter,—whether Bloomfield had possession of them. The same occurs here; a conflict which is for you to decide.

The defendant company is liable to plaintiff for any of these cattle which came to its possession and were retained by it, although it may have been an innocent purchaser of them, without notice of the plaintiff's right, because no one can be divested of his property by the mere act of another purchasing it. If one lose a thing, and it come to the hands of another wrongfully, who takes possession of it, and sells it to a third person in good faith,—that is, the purchaser acting in good faith,—he acquires no title as against the true owner by his purchase. But in order to put the purchaser in the wrong in respect to it; to make it appear that he has appropriated the property to his own use, and made a conversion of it, as we use the phrase in the law, which means only that he has appropriated it to his own use,—there must be something like a demand for it, or some use of it by the person who has possession.

In this instance, the plaintiff relies upon a demand made on Mr. Bloomfield, the defendant's agent, some time in the early part of last

year. As to that matter, if the plaintiff demanded the cattle from the defendant, or the agent of the defendant, bearing certain brands,— the brands under which he claimed them, or the two herds,—and the defendant then had possession of the cattle having such brands, I think the demand was sufficient. The position of the defendant's agent, at all events, was that there were no such cattle in his possession; and if the fact was that he had such cattle at that time, the demand was sufficient, and the failure to comply with it would authorize you to determine that there was a wrongful conversion of the cattle.

These are the general propositions which it is incumbent on the plaintiff to maintain by a preponderance of testimony, in order to recover in this action; that is to say, it must appear to you that the cattle having been turned out in Wyoming, as stated by witnesses on behalf of the plaintiff, came into this state and were appropriated and taken possession of by Mr. Bloomfield, and afterwards turned over to the defendant company by him, and that there was a demand by the plaintiff upon Mr. Bloomfield, as the agent of the defendant company, for the cattle before this suit was brought. As to the number of cattle, of course the defendant cannot be responsible—especially not, as being a purchaser of the property in good faith—for any more than were actually received. I believe some of the witnesses fixed the number. If you find for the plaintiff, you must find for a certain number, as well as the value.

Counsel have submitted a great number of propositions, some of which may require to be noticed in addition to what I have said to you. There are not any of them, I believe, that are quite satisfactory to me in the language that has been used, although they express the law to some extent.

"That in considering the testimony of the witnesses the weight of the evidence is not to be determined by numbers." That proposition is true. You will find some witnesses who impress you as being more worthy of credence than others, and if you believe they state the truth you are at liberty to accept their testimony, although it may be opposed by the testimony of several other witnesses, who are witnesses of equal means of observation, and appear to have equal knowledge of the facts to which they testify. If there is no reason for discrediting the greater number on one side, of course there is weight in numbers. You have greater reason to believe two witnesses who testify to a fact in opposition to one who makes a different statement, when the two appear as worthy of belief as the one who stands opposed to them. These matters of the weight and value of testimony are said to be particularly within the judgment and discretion of a jury. They are to determine the effect of what they have heard, and when the testimony is conflicting they are the absolute judges of its truth.

"If you find the plaintiff owned the bar cattle, and afterwards bought the T cattle and took an assignment from Gillespie, Kelly, and

others of their right of action for them before instituting this suit, you will find for the plaintiff the value of such cattle of either herd which you may find the defendant has converted, without reference to what he paid for the one herd or the other." The point of that instruction appears to be that the amount paid by plaintiff for the animals is of no special importance in this action. That is true. If he is entitled to compensation, the amount paid by him is not a matter for consideration.

"If you find that defendant converted any of the cattle belonging to plaintiff, and that among those converted were cows which either had calves with them at the time of the conversion, or afterwards and before the commencement of this suit had calves, then you are instructed that the plaintiff is entitled to recover the value of such calves or increase, and you may consider as evidence of the number of such increase the average increase of cattle for the years between the time you may find the company took possession and the institution of this suit." That is true, substituting for "the institution of this suit" the time when the demand was made for the cattle. The plaintiff, if entitled to anything, is entitled to the value of the animals with their increase up to the time of the demand made; not the commencement of the suit, but the making of the demand, which was, I believe, in the early part, perhaps near the first, of January, 1884.

(*Mr. Macon* asked as to interest.) Yes. If you find for the plaintiff, he is entitled to interest on the amount from the date of the demand—interest according to the statute of this state—at 10 per cent. per annum.

"The jury is further instructed that the plaintiff's case must be fairly made out and sustained by a preponderance of testimony, and they are not authorized or warranted in finding a verdict against the defendant based upon mere doubt or suspicion. The circumstance that the plaintiff is alleged to be poor, and unable to defray the expense necessarily incurred in connection with the presentation of evidence, or the circumstance that the defendant is alleged to be rich and powerful, and to have superior ability for the presentation of evidence against the plaintiff's case and in support of its own, is not to be considered." That is given in the language which is used.

"The jury is further instructed that the issues in this case, made by the pleadings, present the question whether the plaintiff, Mann, was at any time the owner of the cattle claimed by him, and whether such cattle drifted to Colorado and afterwards came into the possession of the defendant. The answer denies each and all of the propositions stated, and the burden of proving these facts rests upon the plaintiff. The answer contains no admission of any kind which relieves the plaintiff from proving all or any of the facts necessary to show that he was the owner of the cattle mentioned, and that the same have since come into the possession of and been converted by the defendant." That is given.

"The court instructs the jury that negative testimony is entitled to consideration, when, from the nature of things, other testimony cannot be given. If the plaintiff's witnesses swear that cattle, claimed or owned by the plaintiff, were seen or found in certain localities, it is competent for the defendant to show by witnesses who had equal opportunities with the plaintiff's witnesses to testify to the contrary; and if the jury believe that the witnesses who testified that they saw no such cattle at the times and places mentioned, and that such witnesses had reasonable opportunity under the circumstances to know whether the cattle were in such localities as testified to by the plaintiff's witnesses, their testimony is entitled to as much consideration, if the jury believes that the witnesses were equally credible." That is given also. If they have the same opportunities for judging and determining the fact, and they are equally credible, they should receive the same consideration.

I do not recall any other proposition on which I have to say anything, except that if you find that any of these witnesses whose testimony has been contradicted, or seems to be inconsistent, the several parts with each other, has willfully sworn falsely in respect to any material matter, then you are at liberty to disregard the testimony of such witness altogether. That proposition is contained in some of these instructions submitted to me. That is the law in such matters,—that if a witness wilfully, purposely, knowingly testifies falsely, he may be discredited altogether. Of course, a witness is not to be discredited upon a mere mistake that he may make,—a slip of the memory, want of recollection, some infirmity of his mind; but if he deliberately and purposely misstates a fact thereby, he shows himself to be unworthy of belief.

There is nothing else, gentlemen, I believe, which I wish to say to you, unless the counsel think I have omitted something. I advise you to proceed with care. This is an important case to the parties, and you should take your own time. You will be comfortably entertained, under any circumstances; that is, we will give you plenty to eat, and make you as comfortable as we can.